Courtney Bowie*                     John Mejia (USB No. 13965)
Ayirini Fonseca-Sabune*             Leah Farrell (USB No. 13696)
ACLU Foundation, Inc                ACLU of Utah Foundation, Inc.
125 Broad Street, Floor 18          355 North 300 West
New York, New York 10004            Salt Lake City, Utah 84103
Telephone: (212) 549-2500           Telephone: (801) 521-9862
Facsimile: (212) 549-2654           Facsimile: (801) 532-2850
cbowie@aclu.org                     jmejia@acluutah.org
afonseca-sabune@aclu.org            lfarrell@acluutah.org
*pro hac vice application to follow

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF UTAH

------------------------------------------------------------X

KEVIN WINSTON, on behalf of his minor
son K.W., and a class of all similarly situated
individuals.

                    PLAINTIFFS,

vs.

SALT LAKE CITY POLICE DEPARTMENT;
SALT LAKE COUNTY; THE METRO GANG
UNIT THROUGH THE UNIFIED POLICE
DEPARTMENT OF GREATER SALT LAKE by
and through its Board of Directors;
WEST VALLEY POLICE DEPARTMENT;
WEST JORDAN POLICE DEPARTMENT;
SALT LAKE CITY SCHOOL DISTRICT;
SALT LAKE CITY CHIEF OF POLICE
CHRISTOPHER BURBANK, in his official            **Case No. 2:12-cv-01134-PMW**
capacity; SHERIFF JIM WINDER, in his official
capacity; WEST VALLEY POLICE
DEPARTMENT CHIEF OF POLICE THAYLE
NIELSON, in his official capacity; WEST         **PROPOSED CLASS ACTION**
JORDAN POLICE DEPARTMENT CHIEF OF
POLICE DOUG DIAMOND, in his official            **COMPLAINT**
capacity; SALT LAKE CITY SCHOOL
DISTRICT SUPERINTENDENT MCKELL
WITHERS, in his official capacity; SALT LAKE
CITY BOARD OF EDUCATION AND ITS
MEMBERS IN THEIR OFFICIAL
CAPACITIES, and WEST HIGH SCHOOL
PRINCIPAL PARLEY JACOBS, in his official
and personal capacity, DOE DEFENDANTS 1-
11 in their official and personal capacities; and
DOE DEFENDANT 12 in his official capacity.

DEFENDANTS.

------------------------------------------------------------X

1

## PRELIMINARY STATEMENT

Plaintiff Kevin Winston, on behalf of his minor son K.W. (hereinafter "K.W."), and all similarly situated individuals in the Salt Lake City School District, by their attorneys, complain as follows:

1.      This case involves an ill-conceived and unconstitutional plan for a gang task force made up of about 16 police officers to raid West High School and round up students for detention, interrogation and inclusion in a gang database. During the raid, officers picked up Latino, African American and Pacific Islander students whose only mistake was to show up to school and questioned them and photographed them for placement in a gang database, all while still in the school, regardless of whether or not the students had any actual gang membership. Shockingly, only students of color were targeted by the task force.  This fact is no coincidence: as one of the officers explained to K.W.'s mother, the gang raid was meant to address a "problem with the Mexicans" at West High School.

2.      On top of the myriad constitutional violations and common law torts spawned by these events, this raid sent all students of color a clear message: you are suspected gang members, even if all you are doing is going to school. Moreover, the raid signaled to students that even school can be turned into a police station for non-white students.  These messages are especially harmful at a time

2

when Utah is struggling to increase graduation rates for high school students, especially minority students.  Through this lawsuit, the Plaintiffs seek to put an end to the practices and policies that led to the raid, to stop the use of the database to store information about minors who have committed no crimes, and to protect the rights of all students.

3.     On or about December 16, 2010, at the invitation of Salt Lake City Public School District ("SLCSD") West High School administration, Salt Lake City Police Department ("SLCPD") Safe Streets Task Force officers together with Metro Gang Unit Task Force officers from the Unified Police Department of Greater Salt Lake, the West Valley City Police Department and the West Jordan Police Department (hereinafter, the SLCPD, Metro Gang Unit, Unified Police Department, Salt Lake County, West Valley City Police Department, and West Jordan Police Department officers are referred to jointly as the Metro Gang "Task Force") launched a gang sweep of West High School in Salt Lake City, Utah.  Task Force officers entered the school early in the day and remained there for several hours.  In the course of the sweep, officers rounded up between fourteen (14) and forty (40) West High School students without lawful justification, escorted each to the In-School Detention classroom, and held each against his or her will.  The students and their personal belongings were searched without consent.  In addition,

the Task Force officers interrogated and photographed the students and retained the information obtained from students in police investigative files.

4.      All students subjected to the sweep were non-white.  The majority of the students were Latino and a smaller number were African American or Pacific Islander.  Upon information and belief, photographs and information obtained from students were entered into an electronic "gang database," the Gang Reporting Evaluation and Tracking ("GREAT") system, maintained and operated by the Unified Police Department.  Upon information and belief, the Unified Police Department and the Task Force continue to hold records on students detained in the roundup, without probable cause or reasonable suspicion of criminal activity.  Upon information and belief, once information is entered into the GREAT system, it is transferred to law enforcement throughout the state and country regardless of whether or not the individual minor student has been convicted of a gang-related crime.

5.      Administrators at West High School invited the gang unit to the school without notice to parents or students.  On information and belief, administrators and employees – as well as School Resource Officers – at West High School identified West High School students as potential gang members for the Task Force.  K.W., along with at least 13 other students and up to approximately 40, was identified in the sweep, detained, searched, interrogated,

photographed, labeled as a gang member, and included in the gang database, even though he denied gang membership and had no criminal or juvenile delinquency convictions or prosecutions that predicated his identification or resulted from the sweep.

6.      K.W. was a victim of the illegal forced detention, searches, seizures, interrogations, photographing, and inclusion in the gang database and he seeks judicial redress for violations of his civil rights and the rights of the class.  This action is for damages and for declaratory and injunctive relief arising out of the unlawful violations of Plaintiffs' civil rights by SLCSD school officials, Salt Lake City Police Department officers, West Valley Police Department officers, West Jordan Police Department officers, Unified Police Department officers and the Task Force.

7.      Plaintiff, on behalf of himself and a similarly situated class, brings his claims pursuant to the First, Fourth, and Fourteenth Amendments of the United States Constitution, Article I §§ 7, 14, and 24 of the Utah Constitution, and Utah statutory and common law.

## JURISDICTION AND VENUE

8.      This is a police misconduct and race discrimination case brought

pursuant to 42 U.S.C. § 1983, the United States Constitution and state statutory and common law.

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  Venue is proper in this district pursuant to the general venue provision 29 U.S.C. § 1391.

10.     The events giving rise to the claim alleged in this Complaint arose in Salt Lake City, Utah.   Venue is proper in the Central District of Utah.

## PARTIES

### I.     NAMED PLAINTIFF

11.     Plaintiff Kevin Winston, on behalf of his African American minor son, K.W., is a resident of Salt Lake City, Utah.  K.W. attends West High School in Salt Lake City and was a 14 year-old freshman at West High School during the 2010-2011 school year. K.W. intends to remain a student at West High School until he graduates in 2014.

### II.    DEFENDANTS

### A.     SALT LAKE CITY POLICE DEPARTMENT

12.     Defendant Salt Lake City is a municipality incorporated under the

6

laws of the State of Utah and is responsible for the maintenance, control, and supervision of the Salt Lake City Police Department and for establishing policies, procedures and customs by which its employees conduct their official duties.

13.     Defendant Christopher Burbank, sued in his official capacity, is and at all relevant times was Chief of Police of the Salt Lake City Police Department and is responsible for the maintenance, control and supervision of law enforcement personnel employed by the Salt Lake City Police Department.

**B.     UNIFIED POLICE DEPARTMENT OF GREATER SALT LAKE**

14.     Salt Lake County is a municipality incorporated under the laws of the State of Utah and is responsible for the maintenance, control, and supervision of the Unified Police Department of Greater Salt Lake ("Unified Police Department") and for establishing policies, procedures and customs by which its employees conduct their official duties.  The Metro Gang Unit is a division of the Unified Police Department.

15.     Defendant Sheriff Jim Winder, sued in his official capacity, is and at all relevant times was Chief Executive Officer of the Unified Police Department and is responsible for the maintenance, control and supervision of law enforcement personnel employed and controlled by the Unified Police Department.

**C.     WEST VALLEY POLICE DEPARTMENT**

16.     Defendant West Valley City is a municipality incorporated under the laws of the State of Utah and is responsible for the maintenance, control, and supervision of the West Valley Police Department and for establishing policies, procedures and customs by which its employees conduct their official duties.

17.     Defendant Thayle Nielson, sued in his official capacity, is and at all relevant times was Chief of Police of the West Valley City Police Department and is responsible for the maintenance, control and supervision of law enforcement personnel employed by the West Valley City Police Department.  On information and belief, Thayle Nielson was responsible for approving the use of West Valley City officers in the Metro Gang Unit, the Metro Gang Unit's actions in the December 16, 2010 gang sweep were foreseeable and the West Valley City Police Department was deliberately indifferent to the likely violation of constitutional rights.

## D.     WEST JORDAN POLICE DEPARTMENT

18.     West Jordan is a municipality incorporated under the laws of the State of Utah and is responsible for the maintenance, control, and supervision of the West Jordan Police Department and for establishing policies, procedures and customs by which its employees conduct their official duties.

19.     Defendant Doug Diamond, sued in his official capacity, is the Chief of Police of the West Jordan Police Department and is responsible for the

maintenance, control, and supervision of law enforcement personnel employed by the West Jordan Police Department. On information and belief, Doug Diamond was responsible for approving the use of West Jordan officers in the Metro Gang Unit, the Metro Gang Unit's actions in the December 16, 2010 gang sweep were foreseeable and the West Jordan Police Department was deliberately indifferent to the likely violation of constitutional rights.

## E.     DOE DEFENDANTS

20.     Plaintiffs are informed and believe that Doe Defendants #1 through #6 are all officers duly appointed and employed by the Salt Lake City Police Department and/or the West Valley City Police Department and/or the West Jordan Police Department and/or the Unified Police Department and were at all relevant times acting in the course and scope of their employment and acting under color of state law. Upon information and belief, each of the Doe Defendants #1 through #6 participated in the seizure, search, detention, interrogation, and/or collection and maintenance of personal data relating to one or more of the Plaintiffs. In particular, Doe Defendants #1 and #2 were dressed as plain clothed police officers and initially approached, detained, interrogated, and assaulted K.W. on December 16, 2010. Defendants #1 through #6 are sued in their personal and official capacities. The true names of these Defendants are unknown to Plaintiffs. In due

course, Plaintiffs will amend this complaint to identify these Defendants' true names.

21.     Plaintiffs are informed and believe that Doe Defendants #7 through #11 are and were at all relevant times employed by the Salt Lake City School District as campus security officers at West High School and were at all relevant times acting in the course and scope of their employment and under color of state law.  Upon information and belief, each of the Doe Defendants #7 through #11 provided assistance to the Task Force in conducting the sweep on December 16, 2010.  Defendants #7 through #11 are sued in their personal and official capacities. The true names of these Defendants are unknown to Plaintiffs.  In due course, Plaintiffs will amend this complaint to identify these Defendants' true names.

22.     Plaintiffs are informed and believe that Doe Defendant #12 is and was at all relevant times employed by the Salt Lake City School District as an administrator at West High School and was at all relevant times acting in the course and scope of his or her employment and under color of state law. Upon information and belief, Doe Defendant #12 provided assistance to the Salt Lake City Police Department in conducting the roundup on December 16, 2010. Defendant #12 is sued in his or her official capacities.  The true name of this Defendant is unknown to Plaintiffs.  In due course, Plaintiffs will amend this complaint to identify the Defendant's true name.

**F.     SALT LAKE CITY SCHOOL DISTRICT**

23.     Defendant McKell Withers is the current Superintendent of the Salt Lake City School District (SLCSD) and is sued in his official capacity.  Defendant Withers is responsible for carrying out and setting policies of the Salt Lake City School District that continue to harm or threaten to harm the Plaintiffs.  All actions taken by Defendant Withers while acting as the Superintendent of the Salt Lake City School District were taken in the course and scope of his employment and under color of state law.

24.     Salt Lake City School Board Defendant Kristi Swett, president, and Defendants Amanda Thorderson, Alama Uluave, Douglas Nelson, Rosemary Emery, Heather Bennett, Laurel Heath Young, and Martine Cao, are members of and constitute the Salt Lake City Board of Education, the governing body of the Salt Lake City School District.  Said board member Defendants are sued in their official capacities.   These Defendants are, and at all relevant times were, responsible for promulgating policies, rules, and regulations applicable to students of West High School.  All actions taken by these Defendants, while acting as members of the Salt Lake City Board of Education, were taken in the course and scope of their duties as Board members and under color of state law.

25.     Defendant Parley Jacobs, sued in his personal and official capacity, is and was at all relevant times, employed by the Salt Lake City School District as

11

the Principal of West High School.  All actions taken by Defendant Jacobs while working as Principal at West High School were taken in the course and scope of his employment and under color of state law.

## CLASS ACTION ALLEGATIONS

26.     For the purposes of all declaratory and injunctive relief sought in this case, Plaintiff K.W., through his legal guardian, brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) on behalf of himself and all Latino, African American, and Pacific Islander public school students who were enrolled in December 2010 and are enrolled in the public schools in the Salt Lake City School District, as well as all future Latino, African American, and Pacific Islander students who will enroll in Salt Lake City School District public schools.

27.     The members of the class are so numerous that joinder of all members is impracticable.  According to the most recent data available for fall 2012, Salt Lake City School District has 1033 African American students, 968 Pacific Islander students, and 9964 Hispanic students.  In 2010, West High School alone enrolled a total of 2443 students.  Of those students, 119 were identified as African American, 1031 as Hispanic, and 100 as Pacific Islander.  The number of such students who will enroll in the future cannot be determined at this time.

28.     There are questions of law and fact common to the class and these

questions predominate over any questions affecting only individual members. Common questions include, among others: whether the school official Defendants' definition of "gang activity" and "gang-related dress" are unconstitutionally vague in violation of the federal and state Constitutions; whether detaining, searching, interrogating, and photographing students for the reason of including students in a gang database violates the rights of student class members to be free of unlawful searches and seizures under the federal and state Constitutions; whether the decision to allow a task force of police officers to enter a school during school hours to carry out these activities violated the federal and state Constitutions; and whether students included in the class are subjected to racial profiling and discrimination in being targeted for detention, search, interrogation, photographing, and inclusion in the gang database because of their race, ancestry, or national origin in violation of their rights under the federal and state Constitutions and state statutory and common laws.

29.     The representative Plaintiff's claims are typical of the class.  The named plaintiff was identified, detained, searched, interrogated, photographed, and included in the gang database without any lawful justification.  The named Plaintiff has been and will likely again be subjected to the wrongful customs, policies, practices and procedures of the Salt Lake City School District, the Salt Lake City Police Department, and the Task Force.

30.     The legal theories under which the named Plaintiff seeks declaratory and injunctive relief are the same as those on which all members of the class will rely, and the harms suffered by the named Plaintiff are typical of the harms suffered by the class members.

31.     The representative Plaintiff will fairly and adequately protect the interests of the members of the class. The Plaintiff is African American and as such, like Pacific Islander and Latino students at West High School, remains at risk of being disciplined or referred to the police because of SLCSD's gang policies and of being illegally detained, searched, interrogated, and entered into the gang database.   The Plaintiff has retained counsel competent and experienced in complex class action and constitutional and civil rights litigation and with the resources to zealously represent the class.   The named plaintiff is seeking compensatory and punitive damages only on an individual basis.

32.     This action is properly maintained as a class action pursuant to Rule 23(b)(2). The Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## FACTS

**A.     The December 16, 2010 Sweep of West High School**

33.     West High School is a public high school located in Salt Lake City,

Utah within the Salt Lake City School District.  In 2010, West High School had a student body population of approximately 2443 students.  Forty-two percent of those students were Hispanic (1031 students); 40 percent were Caucasian (965); 5 percent were African American (119 students); 4 percent were Pacific Islanders (100 students); and 3 students identified as multi-racial. One hundred percent of the students impacted by the gang sweep were non-white.  Specifically, the students targeted were Latino, African American or Pacific Islander.

34.    On information and belief, in the weeks leading up to December 16, 2010, school administrators from West High School, campus security personnel, and SLCPD School Resource Officers ("SROs") operating out of West High School discussed what they described as an increase in gang activity in the school and in the community.  As evidence of perceived gang activity, Defendant Principal Parley Jacobs cites tagging, gang attire, and gang symbols.  A list of students, described as "known gang members," was generated by school officials and/or SROs and provided to the SLCPD.  Thereafter, the Task Force developed an operational plan for the sweep of West High School to be conducted on December 16, 2010.

35.    On the morning of December 16, 2010, Defendant Task Force officers descended upon West High School and began rounding up students by removing students from their classrooms, approaching students while detained in in-school

detention ("ISD"), and approaching students in the hallways, cafeteria, and other common areas.  Plain-clothed Task Force officers including, upon information and belief, A. Sweeny, N. Warrick, J. Wyckoff, K. Ford, L. Wills, B. Evans, T. Tueller, L. Leuluai, K. Schofield, M. Fullwood, J. Miller, J. Sayes, and several unknown Doe Defendant Task Force officers, were assigned to patrol hallways, common areas, and the parking lot.  Defendant Task Force officers, without lawful justification, detained and interrogated students and then escorted students to the ISD room, if not already held there for in-school detention, and detained students there for further interrogations and searches.

36.     Over the course of the day on December 16, 2010, Defendant Task Force officers, without lawful justification, rounded up and detained at least 14 students, all of whom were on school property and engaged in ordinary and proper activities associated with attending school.  All of the students detained were Latino, Pacific Islander, or African American.

37.     Defendant Task Force officers detained students in the ISD room. Students were escorted in and out of the room throughout the day. Upon information and belief, Officer M. Johnson, Officer M. Voorhees and two unidentified Doe Defendant officers were positioned at computers in the ISD room.  Approximately nine other unidentified Task Force officers and three unidentified campus security officers were also in the room.  Defendants denied

students' requests to make phone calls to their parents and ignored students'

requests to leave the ISD room.  A row of police cars was also visible outside the

front of the school.  By virtue of the actions of the police officers, acting with the

assistance of the school officials, none of the students believed that he or she was

free to leave the ISD room. Students feared being physically restrained, arrested, or

otherwise further punished if they attempted to leave.

38.    Once students were detained in the ISD room, Defendant officers,

acting without lawful justification and without the consent of the students,

searched students' backpacks and other personal property, such as notebooks.

Defendant officers physically seized students' property and took pictures of

notebook pages.  Neither school officials nor Task Force officers informed

students of the basis for the searches.

39.    Defendant Task Force officers, acting without lawful justification and

without the students' consent, removed students individually from the ISD room

and detained them in an adjacent security office to have their pictures taken.

Students were interrogated in the ISD room.  In all instances, interrogations were

conducted within earshot of other students.  Defendant Task Force officers

interrogated students about whether they were in gangs and whether they knew

anyone in gangs.  Students were repeatedly asked the same questions, and were

told that they were lying when they denied involvement with gangs. Defendant

Task Force officers also made other intimidating statements or gestures directed at students.  Such statements and actions were made to intimidate students and obtain compliance with Defendants' commands, and caused great fear and distress among Plaintiffs.

40.    In addition, Defendant Task Force officers acting without lawful justification and without the students' consent, required students to divulge personal identifying information, including students' names, races, and dates of birth, and recorded these along with the students' purported gang affiliation and nicknames on whiteboards.  Defendants then, without lawful justification and without the students' consent, required students to have their photographs taken holding up whiteboards identifying them as gang members.

41.    Defendants Officer M. Johnson, Officer M. Voorhees, and two unidentified Doe Defendant officers entered information obtained through interrogations of students into computers.  Upon information and belief, the information and photographs obtained by Defendant Task Force officers was entered into an electronic "gang database," called the Gang Reporting Evaluation and Tracking ("GREAT") System, maintained and operated by the Unified Police Department. Some students were informed that their names would be removed from the database in four years if they stayed out of trouble.  Other students were informed that their names would be removed from the database in two years if they

stayed out of trouble.  Students were not provided any further information about the database.  On information and belief, this database is accessible to law enforcement personnel throughout the state of Utah because it is forwarded to the Utah Law Enforcement and Information Network ("ULEIN").  Moreover, on information and belief, information from this database is available to law enforcement officers throughout the country because it is also placed in the National Crime Information Center ("NCIC"), a federal database available to police across the country.  The students were placed in the database without lawful justification, without having committed crimes, or without having been convicted of any offense and are now subjected to additional police scrutiny as a result.

42.     Defendant Task Force officers detained students for up to two hours.

43.     Upon information and belief, all students detained during the round up are Latino, with the exception of some and Pacific Islander students and K.W., who is African American.  In one instance, one or more of the Defendant Task Force officers and/or Defendant school officials brought a white student into the ISD room, who began to curse at the officers in the room.  When the officer(s) who brought the white student in explained that it was a "practical joke," and that the student had been coached to act up, Defendant police officers and school officials in the ISD room laughed. This racially motivated "joke" was visible and audible to all students present in the ISD room, causing the students great humiliation and

distress and clearly signaling to the students that the targets of the raid were students from certain minority groups.

44.     On information and belief, the officers conducting the raid played at least one other "practical joke" at the expense of the students in the ISD room, reflecting a lack of professionalism and disregard for the well-being of the students.

**B.  Facts Relating to the Individual Named Plaintiff**

45.     During the lunch period on December 16, 2010, K.W. was sitting at a lunch table with four friends, three Caucasian students and one Asian student, waiting to begin his part-time work shift at the cafeteria.  K.W. was approached by two unidentified plain-clothed police officers who asked if they could speak with him, telling K.W. that they would make him "look cool."  K.W. thought that the men were teachers and that he had been selected for an award.  K.W. went with the officers to a small room adjacent to the entryway of the cafeteria.

46.     Once in the small room, the officers accused K.W. of vandalizing the school with graffiti.  K.W. denied the allegations and asked the officers why they were questioning him.  The officers told K.W. that a teacher had identified him as a gang member, but refused to state which teacher had identified him. K.W. became upset, announced to the officers he was returning to the cafeteria table and attempted to do so.

47.     As K.W. attempted to move, one of the officers told K.W. to "quit acting tough" and grabbed his arm, leaving a small red bruise that remained there that day.  K.W. told the officer not to touch him.  One of the officers then told K.W. he if he wanted to "act tough," he could "go to ISD."  K.W., believing that school representatives in the ISD room would help him resolve the baseless accusations and clarify for him what was going on, said he would go to ISD.  As K.W. walked to the room, the two officers closely followed him, ensuring that he would actually go there.

48.     At the time the officers approached him in the lunch room, K.W. was wearing a blue hooded sweatshirt, black jeans, Nike socks, sneakers, and a backpack designed by the manufacturer to include blue and yellow graffiti-style writing.  One other student sitting at the table with K.W. had hand-drawn graffiti on her backpack, but neither she nor any of the other students K.W. was with were detained or interrogated.

49.     Once he arrived at the ISD room, K.W. asked if he could leave.  An officer told him that he should cooperate with them first.  K.W. asked for permission to call his mother.  An unidentified Task Force officer further denied K.W.'s request to call his mother.

50.     In the ISD room, K.W., like other students rounded up, was made to submit to a search.  An unidentified Task Force officer asked K.W. if he could

inspect the contents of his backpack, but grabbed the items without waiting for a reply and proceeded to closely examine everything in the backpack.  After emptying K.W.'s backpack, the officer went through K.W.'s class notebooks, including a notebook for art class, and photographed several pages.  The officer told K.W. that the notebooks, including K.W.'s art notebook, had gang drawings in them.

51.    During and after the non-consensual search of his backpack, K.W. was interrogated by Defendant Task Force officers.  At first, K.W. tried not to respond to the police officers' questions.  Defendant Task Force police officers told K.W. that they only wanted to ask a few questions and that it would not hurt. K.W. feared that he would be arrested if he did not cooperate with the officers. The police officers repeatedly asked K.W. whether he was in a gang and which gang he was in.  When K.W. repeatedly responded that he was not in a gang, the police officers told him that they were going to mark him down as a "tagger."  The police officers asked K.W. for personal identifying information, including his name, race, and birthdate.  K.W. responded and offices wrote the information down on a whiteboard, including his response that his race was "black and white," along with the phrase "gang tagger."

52.    Defendant Task Force officers then required K.W. to stand to have his

photograph taken while holding the whiteboard identifying him as a "gang tagger."
When K.W. hesitated and did not move quickly enough, a police officer forcibly
positioned K.W. to be photographed.

53.     After they took his photograph, officers informed K.W. that his
information was going to be placed in a gang database.

54.     It was only after they took his photograph that the officers told K.W.
that he could leave the ISD room.

55.     K.W. was detained for at least an hour and held in the ISD
room surrounded by police officers.  The detention of K.W. was arbitrary and
capricious and without any lawful justification.  During this time, he was not
permitted to call his parents or leave the room.

56.     Defendant Task Force officers released K.W. after his detention,
interrogation, and photographing, and provided him a note to excuse his late arrival
at class. While detained, K.W. missed working his shift in the cafeteria as well as
his next period class.  Upon release, K.W., shaken and extremely upset, called his
mother from the student services office.  Unable even to talk about what had
occurred, K.W. managed to say that he had an emergency and asked his mother to
pick him up.

57.     After calling his parents, K.W. waited outside to be picked up.  K.W.

was visibly distraught and crying when two Task Force officers exited the building and noticed him.  One of the officers who had earlier assaulted him proceeded to taunt K.W., saying words to the effect of, "look at the tough guy; you're not so tough anymore."  K.W.'s father arrived to pick him up after being contacted by his mother and dropped K.W. off at his home.

58.     K.W. was greeted by his mother, Lisa Winston, upon returning home. Lisa Winston had never seen K.W. so upset.  He appeared traumatized and could not talk about what had happened to him. K.W. eventually handed Lisa Winston the note which he was given by the police and described what had occurred.

59.     After learning what had happened to her son, Lisa Winston called school administration to ask for an explanation.  Not satisfied with the response from the school official, she took K.W. back to West High School intending to ask school officials what K.W. had done to warrant being detained and interrogated by police.  K.W. also wanted to pick up his schoolwork for the afternoon.

60.     When they got to school, Lisa Winston and K.W. approached a group of approximately 16 police officers and/or school security personnel standing throughout the entry hallway of West High School, near the ISD room and the security office.

61.     Lisa Winston asked why the police were at West High School, to

which a Defendant Task Force officer replied words to the effect of "there's a problem with the Mexicans."  Defendant Task Force officers were visibly shocked when Lisa Winston, who is Caucasian, informed them that she was K.W.'s mother. K.W. heard police officers tell his mother that "she had her head up her ass" if she thought that K.W. was not a gang tagger, because K.W. had adopted the "tagger name" of "Maze" and had been vandalizing the school with graffiti and had been lying to her about his criminal activities.  These allegations were completely baseless.  When asked by Lisa Winston why the officers thought K.W. was in a gang, one of the Defendant officers responded by stating it must have been because he "looks Mexican."  Others asserted that K.W. would wear "gang clothes" while at school, then change clothes on the way home to fool his parents.  This allegation was untrue.  Defendant Task Force officers refused to provide Lisa Winston with the photograph of K.W. and told her that they were not required to provide her with any information.  They further told Lisa Winston that K.W. would be included in a gang database and would be removed after two years if he behaved.

62.    Later the same afternoon, Lisa Winston spoke with West High School Assistant Principal Ken DeVries.  DeVries assured Lisa Winston that K.W. never should have been detained by the police, and assured her he would find out what had gone wrong.  DeVries told Lisa Winston that he had called Defendant Salt Lake City School District Superintendent McKell Withers to inquire about the

incident.  Lisa Winston did not receive any further contact from DeVries regarding the December 16, 2010 roundup.

63.     At a later time after the date of the incident, Lisa Winston again attempted to obtain a copy of the photograph of K.W. and any records that the Task Force had generated regarding K.W. Lisa Winston was told by Defendant SLCPD that any records regarding K.W. had been destroyed when they realized that K.W. was not actually a gang member.

64.     As a result of Defendants' actions, K.W. experienced emotional difficulties, stress, embarrassment, anxiety, and humiliation.  He temporarily transferred out of West High School following the incident for the spring 2011 semester in order to avoid harassment from the SROs and the hostile environment at the school.  K.W. no longer trusts teachers or school administrators and constantly fears getting in trouble.  Even though he is a talented artist, he stopped drawing altogether and is pursuing photography in order to avoid being mislabeled.

65.     In fact, although K.W. had never been in serious trouble in school before the December 16, 2010 incident, K.W. was again targeted for search and interrogation at West High School in the fall of 2011.  A teaching assistant witnessed K.W. and another student exchange a handshake greeting at the start of class and reported K.W. and the other student to the principal as engaging in a drug transaction.  K.W. and the other student were called to the security room where

Officer Smith made K.W. empty his pockets and the other student was patted down. The other student's hands were also sniffed. No drugs were found. K.W. fears that he will continue to be accused of wrongdoing, detained and searched by police and school officials. Officer Smith has attempted to ticket K.W. away from school on another occasion without any reasonable suspicion or probable cause.

66.     K.W. also refused to carry a notebook and even resisted carrying a backpack for several months after the incident and his mother had to write a note explaining this to teachers. K.W.'s grades have fallen.

67.     K.W.'s self-esteem has suffered as a result of Defendants' actions. K.W. has refused to draw since the incident, fearing that his drawings would be found and used to accuse him of being a gang tagger. After the incident, K.W. feels that his teachers look at him as if he were a criminal. K.W. told his parents that he hates being black. K.W. is seeking counseling to help him cope with the emotional and psychological effects of being racially profiled and targeted for police interrogation and detention.

## C.     The Sweep of West High School was Conducted Pursuant to Official Task Force Policy

68.     Defendant Task Force officers implemented and enforced a policy, practice and/or custom of detaining, interrogating, searching, seizing property from, and creating gang database surveillance files on students while on school

grounds and in violation of the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment.  This unconstitutional conduct is a direct and proximate result of policies, practices and/or customs of Defendant Task Force and the SLCPD.

69.     The unconstitutional conduct of Task Force officers in the course of the sweep of West High School was engaged in pursuant to the formal operational plan titled "Targeted Gang Enforcement/West High School/December 16, 2010," which was printed on SLCPD letterhead and which constitutes an official policy of the Task Force and the SLCPD.  The plan assigned and authorized officers to enter West High School for the purpose of criminal investigation.  It called for the coordination of officers from across departments and defined the scope and conduct of the mission.  The plan was designed to "outline a detailed deployment strategy . . . supervisory and reporting guidelines, rules of engagement, and contingency strategies."  This plan was implemented by Task Force officers.

70.     The Targeted Gang Enforcement policy directly and proximately caused injury to K.W.'s constitutional rights and the rights of students subjected to Task Force action on December 16, 2010.  The policy directed Task Force officers to enter West High School without probable cause or even reasonable suspicion.  Officers were not responding to an immediate threat.   Task Force officers did not enter West High School with an expectation that criminal activity was afoot; to the

contrary, according to the operational plan for the gang sweep, "arrest[ing] violations of law where observed" appears fourth on the list of mission priorities. The Task Force's primary mission was to "document known gang members," "gather gang intelligence," and arrest students with outstanding warrants.  The Task Force's mission was structured so as to intimidate, harass, and shame targeted West High School students.  The mission explicitly calls for gang enforcement activities to be of "high visibility."

71.     The Targeted Gang Enforcement policy directly and proximately caused K.W. and other students like him to be unlawfully seized, searched, interrogated, and to have their photographs and information retained. The Targeted Gang Enforcement policy instructed Task Force officers to identify "potential and known gang members from the student body" without suspicion of criminal activity.  The policy further required Task Force officers to detain identified students, to "field card and document" the students, to "interview these gang members for additional gang intelligence," and to photograph students, all without suspicion of criminal activity.

72.     The unlawful seizure, search, interrogation, and inclusion of students in a criminal gang database was also conducted pursuant to and is indicative of the policy, practice, and/or custom of the Task Force.

73.     Field carding, photographing, and retention in a gang database

without requisite suspicion of criminal activity are officially endorsed policies of the Task Force. SLCPD is on the governing board of the Safe Streets Task Force and the Salt Lake Area Gang Project.

74.     Seizing and interrogating students on school grounds for the purpose of criminal investigation without probable cause was and continues to be a sanctioned practice of the SLCPD because it has an ongoing physical presence in the Salt Lake City public schools, making illegal searches and seizures likely to reoccur.

75.     Defendant Principal Jacobs and other school district employees acted in concert with the Task Force to implement the December 16, 2010 gang sweep and have continued to implement, enforce, encourage and sanction a practice and/or custom of assisting, cooperating with, and/or failing to act in opposition to Defendant SLCPD and/or Task Force officers in violating the rights of students at West High School.  The unconstitutional conduct of the school district Defendants is a direct and proximate result of policies, practices and/or customs of the Salt Lake City School District and the Salt Lake City School District Board of Education.

76.     Defendant Principal Jacobs's decision to permit the Task Force to enter the school was unrelated to any school purpose.  Principal Jacobs indicates that no records were made, no information was gathered, and no information was

kept by or at the school.  Principal Jacobs permitted the Task Force to conduct a sweep of the school despite the lack of any imminent threat of criminal activity or physical danger.   The impetus identified by Principal Jacobs as stated in the operational plan amounts to "tagging, gang attire, gang symbols, etc. in the school and in the community."

77.    The school district Defendants each knew, or should have known, that as a direct and proximate result of the policies, practices and/or customs described herein, the constitutional rights of approximately forty students, particularly Latino, African American, and Pacific Islander students, would be violated. Despite this knowledge, the school district Defendants acted with deliberate indifference to and reckless disregard for the constitutional rights of the students; school district Defendants have implemented, enforced, encouraged, sanctioned and failed to rectify such policies, practices and/or customs.

D.    **West High School's Prohibition on Gang Activity**

78.    Salt Lake City School District has a gang policy that, despite being unconstitutionally vague because it does not adequately define for students or their parents what conduct is prohibited, West High School did not even follow prior to inviting the police to the school to conduct an intrusive sweep of its non-white students.  This led to administrators and staff at the high school with the Task Force developing a list of only non-white students to be targeted by the gang

sweep and then allowed members of the Task Force to roam the halls of West High

School stopping and questioning students of color randomly and without cause.

79.    On December 7, 2010, the Salt Lake City School Board, as the policy-

making authority for the Salt Lake City School District, promulgated Salt Lake

City School District Board Policy S-3, which prohibits "gang activity, including

the possession, use, wearing or displaying of any gang apparel or manner of

grooming," as well as "supporting, encouraging, and assisting in activities that

violate this policy."  The administrative procedures attached to Policy S-3 direct

schools to develop implementing rules and procedures to be published in a

handbook made readily available to students.

80.    In June 2005, West High School issued its Dress Code Policy,

included in the Student Handbook, which was in effect on December 16, 2010 and

remains in effect.  The Dress Code Policy states: "Clothing or accessories that

might endanger the safety and welfare of self and others (including symbols/colors

which the Salt Lake Area Gang Task Force has indicated are related to gangs) will

not be allowed."  The clarification of the policy states: "No gang-related dress.  No

bandanas of any color or design will be allowed.  Bandanas will be confiscated by

security personnel. No sagging will be allowed.  All pants are to be worn at the

waist.  This includes any clothing worn by a student which gives the obvious

appearance of sagging . . . Military style or 'webbed' belts, if worn, must be in the

belt loops, not hanging.  Belt buckles must NOT have initials on them. They will be confiscated."

81.     The West High School Student Handbook also includes what it describes as a summary of Salt Lake City School District Student Discipline Policy, which states: "You **MAY** be removed from school for … gang-related attire or activity." The decision to remove, the type, and the length of discipline is left to school administrators.

82.     On August 6, 2010, the Salt Lake City School Board, as the policy-making authority for the Salt Lake City School District, promulgated Administrative Procedures for Policy S-3.  The Administrative Procedures are not made available to students or parents.  The Administrative Procedures define a gang as "[a]ny organization, association, or group of three or more persons, whether formal or informal, which has a common name, a common identity, or a common sign or symbol, where members engage in or have engaged in, a pattern of criminal activity."   The Administrative Procedures further instruct that students may be suspended for up to five days for "gang-related attire or gang-involved activity that is dangerous or disruptive."   However, the definition of gang-involved violations does not include an element of dangerousness or disruptiveness.  It states: "Violations include wearing any attire or engaging in any activity, including posturing and 'mad-dogging', which is determined to be related

to or affiliated with any known or unknown gang. In addition, wearing, possessing, using, distributing, displaying or selling any clothing, jewelry, apparel, emblems, badges, tattoos, or manner of grooming, accessories, symbols, signs or other thing, which is evidence of membership in, or affiliation with, any gang, is prohibited."

83.     Salt Lake City School District Board Policy S-3, Salt Lake City School District Administrative Procedures for Policy S-3 and the Dress Code Policy, as pertains to gang-related attire, on pages 9 and 10 of the 2010-2011 of the West High School Student Handbook were and are void on their face because they are so vague that they violate the due process clause of the Fourteenth Amendment in that they: (a) fail to define prohibited activity clearly so that the ordinary person can understand what conduct is prohibited; and (b) fail to provide guidelines to school officials and law enforcement personnel to prevent the possibility of arbitrary and discriminatory enforcement.

84.     Despite Salt Lake City School District policy – vague as it is – that makes so-called "gang activity" an offense punishable by suspension, the district instead opted to subject its students to the Task Force, as described below.

85.     Furthermore, the Salt Lake City District Policy requires that the school have a "legal order" or "exigent circumstances" before subjecting its students to law enforcement.  And even in those cases, the school officials should "always attempt to contact and seek the advice and consent of a parent" prior to

doing so.  However, despite knowing that a group of all non-white students would be subjected to interrogation at the hands of the Task Force, the school officials failed to follow their own policy and deliberately permitted the rights of the students to be violated.

86.     The Salt Lake City School District Policy regarding the police in schools is clear and is described as follows.  On January 5, 2010, the Salt Lake City School Board, as the policy-making authority for the Salt Lake City School District, promulgated Salt Lake City School District Board Policy S-7.  Policy S-7 states: "in the absence of either a legal order or exigent circumstances, school officials should always attempt to contact and seek the advice and consent of a parent or legal guardian before allowing law enforcement access to a student at school."  Policy S-7 states further: "SROs have many functions, including school safety, student discipline, and law enforcement.  When SROs are investigating alleged crimes for law enforcement agencies, they should be treated as law enforcement officers, not as school employees."

87.     The West High School Student Handbook issued for the 2010-2011 school year states that violations of school policy may result in "possible law enforcement referral" at the second offense, and at the third offense "possible Resource Officer (police) referral." The school district Defendants blatantly

disregarded its own policy and referred students to the Task Force prior to any documented school offenses.

88.    On July 28, 2010, the Salt Lake City School Board, as the policy-making authority for the Salt Lake City School District, promulgated Administrative Procedures for Board Policy S-7.  The Administrative Procedures are not made available to students or parents.  The Administrative Procedures for Policy S-7 state: "School officials should provide immediate access to students for law enforcement interview under the following conditions: (a) The law enforcement officer presents a warrant, subpoena, or legal order; (b) Exigent circumstances exist, such as when police are in pursuit of a suspect on school property, when any student is in serious imminent danger, or when police indicate that a student has run away from parents or legal guardians." Administrative Procedures for Policy S-7 consider School Resource Officers to be acting as law enforcement officers when they act for the purpose of criminal investigation and prosecution, but not when SROs act "for the purpose of maintaining ordinary safety and student discipline or for other educational reasons."  Administrative Procedures for Policy S-7 instruct that the "principal or other school official should request that the law enforcement interviewer inform the student if the student is a suspect of a crime or if the student becomes a suspect of a crime during the course of the interview."  Further, the "principal or other school official should request a

termination of the interview if the student requests that the interview be terminated." Despite this policy, the practice and custom of SLCSD is to permit law enforcement such as the Task Force unfettered access to students without justification or parental notification or protection.

## F.   The Task Force's Policy, Practice, and/or Custom of Unlawful Search and Seizure in a Salt Lake City High School

89.    The unconstitutional practices of the Task Force described herein are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City with the direct knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments.  The practices described herein constitute official policy of the Salt Lake City School District and the Salt Lake City Board of Education because they are longstanding and widespread practices about which the Board and Defendant Superintendent knew or should have known, but failed to remedy.

90.    Alternatively, these practices constitute official policy of the Salt Lake City School District and the Salt Lake City Board of Education because they were promulgated by the Defendant Superintendent and Defendant Principal, who have final policy making authority on school disciplinary matters pursuant to state law; and/or to whom such authority has been delegated by the Board of Education.

91.    Alternatively, these practices constitute official policy of the Salt Lake

City School District and the Salt Lake City Board of Education because they were

undertaken pursuant to official policy promulgated by the Board.

92.    Alternatively, the school district Defendants are liable for these

practices because they have a policy of failing to adequately train or supervise Salt

Lake City School District officials in the administration of discipline or police

access to students, which foreseeably resulted in the harms described herein. On

information and belief, Salt Lake City School District and the Salt Lake City Board

of Education never provided Defendant Superintendent and Defendant Principal

with any form of training or supervision regarding the administration of the

relationship with SLCPD officers and Task Force officers within the Salt Lake

City schools.

93.    K.W. and the Plaintiff Class have no adequate remedy at law.

**G.     The Challenged Actions and Inactions as to Defendant Salt Lake City
Police Department's Policy**

94.    For all purposes relevant to this Complaint, all Defendants have acted

and continue to act with the intent to discriminate against K.W. and members of

the Plaintiff Class.

95.    The practices described herein constitute official policy of the SLCPD

because they are longstanding and widespread practices about which the Chief of

Police knew or should have known, but failed to remedy.

96.    Alternatively, these practices constitute official policy of the SLCPD because they were promulgated by the Chief of Police, who has final policy making authority on law enforcement matters within Salt Lake City.

97.    Alternatively, these practices constitute official policy of the SLCPD because they were undertaken pursuant to official policy promulgated by the SLCPD.

98.    Alternatively, Defendants are liable for these practices because they have a policy of failing to adequately train or supervise SLCPD officers in law enforcement practices related to juveniles and students, which foreseeably resulted in the harms described herein. On information and belief, SLCPD never provided School Resource Officers or other officers with adequate training or supervision regarding their actions and inactions within the Salt Lake City Schools.

99.    K.W. and the Plaintiff Class have no adequate remedy at law.

**H.    The Challenged Actions and Inactions as to Defendant Unified Police Department and Salt Lake County**

100.    For all purposes relevant to this Complaint, Defendants have acted and continue to with the intent to discriminate against K.W. and members of the Plaintiff Class.

101.    The practices described herein constitute official policy of the Unified

Police Department because they are longstanding and widespread practices about which the Sheriff knew or should have known, but failed to remedy.

102.   Alternatively, these practices constitute official policy of the Unified Police Department because they were promulgated by the Sheriff or the Unified Police Department's Board, who has final policy making authority on law enforcement matters within Salt Lake County.

103.   Alternatively, these practices constitute official policy of the Unified Police Department because they were undertaken pursuant to official policy promulgated by the Unified Police Department.

104.   Alternatively, Defendants are liable for these practices because they have a policy of failing to adequately train or supervise Unified Police Department officers in law enforcement practices related to juveniles and students, which foreseeably resulted in the harms described herein.

105.   K.W. and the Plaintiff Class have no adequate remedy at law.

I.     **The Challenged Actions and Inactions as to Defendant West Valley City Police Department**

106.    For all purposes relevant to this Complaint, Defendants have acted and continue to act with the intent to discriminate against K.W. and members of the Plaintiff Class.

107.   The practices described herein constitute official policy of the West

Valley City Police Department because they are longstanding and widespread practices about which its Chief of Police knew or should have known, but failed to remedy.

108.   Alternatively, these practices constitute official policy of the West Valley City Police Department because they were promulgated by its Chief of Police, who has final policy making authority on law enforcement matters within West Valley.

109.   Alternatively, these practices constitute official policy of the West Valley City Police Department because they were undertaken pursuant to official policy promulgated by the West Valley Police Department.

110.   Alternatively, Defendants are liable for these practices because they have a policy of failing to adequately train or supervise West Valley City Police Department officers in law enforcement practices related to juveniles and students, which foreseeably resulted in the harms described herein.

111.   K.W. and the Plaintiff Class have no adequate remedy at law.

**J.     The Challenged Actions and Inactions as to Defendant West Jordan Police Department**

112.   For all purposes relevant to this Complaint, Defendants have acted and continue to act with the intent to discriminate against K.W. and members of the Plaintiff Class.

113.   The practices described herein constitute official policy of the West Jordan Police Department because they are longstanding and widespread practices about which its Chief of Police knew or should have known, but failed to remedy.

114.   Alternatively, these practices constitute official policy of the West Jordan Police Department because they were promulgated by the Chief of Police, who has final policy making authority on law enforcement matters within West Jordan.

115.   Alternatively, these practices constitute official policy of the West Jordan Police Department because they were undertaken pursuant to official policy promulgated by the West Jordan Police Department.

116.   Alternatively, Defendants are liable for these practices because they have a policy of failing to adequately train or supervise West Jordan Police Department officers in law enforcement practices related to juveniles and students, which foreseeably resulted in the harms described herein.

117.   K.W. and the Plaintiff Class have no adequate remedy at law.


**REQUEST FOR RELIEF**

118.   As a direct and proximate result of the conduct of the Defendants described above, K.W. and individuals similarly situated have been denied their constitutional and statutory rights as stated below and have been damaged in an

amount which is not yet known.  K.W. will seek leave of Court to amend this Complaint to conform to proof at time of trial.  K.W. and individuals in the Plaintiff Class have suffered and continue to suffer mental and emotional distress, humiliation, embarrassment, stress, and anxiety.

119.   Defendants' collective acts were willful, wanton, malicious, and oppressive and done with conscious disregard and deliberate indifference for Plaintiffs' rights.  Therefore, Defendants' actions justify an award to the named Plaintiff K.W. of punitive damages in an amount to be determined at trial.  The Plaintiffs do not seek punitive damages on behalf of the class.

120.   Defendants' policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiffs, including but not limited to further violations of their statutory and constitutional rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.  Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants from continuing to engage in and enforce the unconstitutional and illegal policies, practices, conduct, and acts described herein.

121.   At all times herein mentioned, Defendants had an obligation to comply
with federal and state laws regarding racial discrimination.  Defendants failed to meet these obligations.

122.   Defendants, in various official capacities acting under color of state law instituted, authorized, tolerated, ratified, permitted and acquiesced in policies, practices and customs of detentions, interrogations, searches and seizures, photographing, and including students in gang databases without probable cause or reasonable suspicion that such actions would reveal any evidence that the Plaintiffs had violated or were violating any laws or any valid school rules.  Defendants in various ways have indicated they intend to continue such policies and practices.

123.   Defendants have acted with deliberate indifference to the rights of K.W. and of the Plaintiff Class.

## FIRST CLAIM FOR RELIEF: FOURTH AMENDMENT CLAIM

124.   Paragraphs one through 123 are incorporated herein by reference the same as if pleaded in full.

125.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by 42 U.S.C. § 1983 and the Fourth Amendment to the United Stated Constitution, which prohibits unreasonable search and seizure.

## SECOND CLAIM FOR RELIEF:

## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM

126.   Paragraphs one through 125 are incorporated herein by reference the same as if pleaded in full.

127.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United Stated Constitution, which prohibits discrimination on the basis of race, ancestry or national origin.  Their actions were taken with a discriminatory purpose and had a discriminatory impact on Plaintiff K.W. and similarly situated individuals.

## THIRD CLAIM FOR RELIEF:

## FOURTEENTH AMENDMENT DUE PROCESS CLAIM AND FIRST AMENDMENT CLAIM

128.   Paragraphs one through 127 are incorporated herein by reference the same as if pleaded in full.

129.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment and the First Amendment to the United States Constitution, which prohibits the enactment of overly vague laws.

## FOURTH CLAIM FOR RELIEF:

## PROCEDURAL AND SUBSTANTIVE DUE PROCESS

130.   Paragraphs one through 129 are incorporated herein by reference the same as if pleaded in full.

131.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated the rights guaranteed to the Plaintiffs by the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution with respect to Plaintiffs' placement in a police database, which prohibit governmental action without justification and without process.

## FIFTH CLAIM FOR RELIEF

## UTAH CONSTITUTION ARTICLE I § 14 CLAIM

132.   Paragraphs one through 131 are incorporated herein by reference the same as if pleaded in full.

133.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by Article I § 14 of the Utah Constitution, which prohibits unreasonable search and seizure.

## SIXTH CLAIM FOR RELIEF:

## UTAH CONSTITUTION ARTICLE I § 24 CLAIM

134.   Paragraphs one through 133 are incorporated herein by reference the same as if pleaded in full.

135.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by Article I § 24 of the Utah Constitution, which prohibits discrimination on the basis of race, ancestry or national origin.

## SEVENTH CLAIM FOR RELIEF:

## UTAH CONSTITUTION ARTICLE I § 7 CLAIM

136.   Paragraphs one through 135 are incorporated herein by reference the same as if pleaded in full.

137.   Article I § 7 provides for due process of law.  Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by Article I § 7 of the Utah Constitution, which prohibits the enactment of overly vague laws.

## EIGHTH CLAIM FOR RELIEF:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

138.   Paragraphs one through 137 are incorporated herein by reference the same as if pleaded in full.

139.   Defendants' conduct as alleged in this Complaint and through the action of the Doe Defendant that taunted K.W. resulted in Intentional Infliction of Emotional Distress because it was outrageous; it was intended to cause and/or it recklessly disregarded the probability of causing K.W. severe emotional distress; and  it did cause K.W. severe emotional distress.

## NINTH CLAIM FOR RELIEF:

## ASSAULT

140.   Paragraphs one through 139 are incorporated herein by reference the same as if pleaded in full.

141.   Defendants' conduct as alleged in this Complaint and through the conduct of the Doe Defendant that grabbed K.W. resulted in K.W.'s assault and bodily injury, in violation of § 76-5-102 of the Utah Criminal Code and Utah Common Law.

## TENTH CLAIM FOR RELIEF:

## CONSPIRACY TO DEPRIVE PLAINTIFFS OF

## CONSTITUTIONAL RIGHTS

142.   Paragraphs one through 141 are incorporated herein by reference the same as if pleaded in full.

143.   Defendants' pattern, practice, and customs as alleged in this Complaint have violated rights guaranteed to Plaintiffs by 42 U.S.C. § 1985 through a conspiracy to deprive K.W. and the Plaintiff Class of equal protection of the law through the Task Force's December 16, 2010 gang sweep at West High School.  The conspiracy resulted in injury to K.W. and the Plaintiff Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.   Assume jurisdiction over this matter;

2.   Certify this action as a class pursuant to Fed. R. Civ. P. 23;

3. Declare Defendants' collective actions and inactions, including the identification, detention, search, seizure, interrogation, photographing, and inclusion in a gang database violate the rights guaranteed to Plaintiff Class by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 7, 14, and 24 of the Utah Constitution, 42 U.S.C. § 1985, § 76-5-102 of the Utah Criminal Code and Utah Common Law;

4. Enjoin any further violation of Plaintiff's and the Plaintiff Class's constitutional and statutory rights;

5. Order the Task Force Defendants to expunge from all records in their custody or under their control information unlawfully obtained from members of the Plaintiff Class;

6. Issue an injunction prohibiting

   a. the Salt Lake City School District, including West High School and all those acting under their supervision or control, from enforcing Policy S-3 prohibiting gang-related attire or any rules that purport to define gang related conduct, activity or affiliation and activity to the extent that such rules and/or regulations are, or are capable of being, applied in an arbitrary or discriminatory manner;

b. the Task Force Defendants, in concert with Salt Lake City School District, and all those acting under their supervision or control, from detaining, searching, seizing the belongings of, interrogating, or photographing students in the Salt Lake City School District without probable cause or reasonable suspicion to believe that the student violated a valid school rule or has violated the law, and further prohibiting the Task Force Defendants from including any Salt Lake City School District student in any database or other record indicating that said student is a member of a prohibited gang without probable cause to believe that such student is in fact a member of a prohibited gang;

7. Award compensatory and general damages, in an amount to be proven at trial, against the Salt Lake City School District, the City of Salt Lake, the Task Force Defendants, and against each of the individual Defendants sued in his or her personal capacity;

8. Award exemplary and punitive damages, in an amount to be proven at trial, against the Salt Lake City School District, the City of Salt Lake, the Task Force Defendants, and against each of the individual Defendants sued in his or her personal capacity;

9. Award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. §

  1988; and

10. Grant any other relief the Court deems necessary and proper.


Dated this 13th day of December, 2012.

Respectfully submitted,

_____/s/_____
John Mejia, Esq.  (USB No. 13965)
Leah Farrell, Esq. (USB No. 13696)
American Civil Liberties of Utah Foundation, Inc.
355 North 300 West St.
Salt Lake City, Utah 84103
Tel: 801-521-9862
Fax: 801-532-2850
jmejia@acluutah.org
lfarrell@acluutah.org

Courtney A. Bowie, Esq.*
Ayirini Fonseca-Sabune, Esq.*
American Civil Liberties Union Foundation
125 Broad St.
New York, NY
Tel: (212) 549-2500
Fax: (212)  549-2654
cbowie@aclu.org
afonseca-sabune@aclu.org
*pro hac vice application to follow